# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEROME JUNIOR WASHINGTON, | Civil Action No. 18 – 1558 |
| Plaintiff, | |
| v. | Magistrate Judge Lisa Pupo Lenihan |
| SUPERINTENDENT GILMORE, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION[1]

Pending before the Court is a Motion to Dismiss filed by Defendants Hammer and Smith. (ECF No. 48.) For the following reasons, the Motion will be granted. Additionally, because Plaintiff also fails to state a claim for relief against Defendants Gilmore, Wood and Nicholson and they will be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

### I.     Procedural Background

Plaintiff Jerome Junior Washington ("Plaintiff") is an inmate in the custody of the Pennsylvania Department of Corrections ("DOC"). He initiated this action with the filing of a Motion for Leave to Proceed *in forma pauperis* on November 19, 2018 (ECF No. 1), which this Court granted on November 27, 2018 (ECF No. 2), and Plaintiff's Complaint (ECF No. 3) was docketed that same day. The Complaint, which Plaintiff has filed pursuant to 42 U.S.C. § 1983,

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. (ECF Nos. 25, 31, 78.)

alleges violations of the Eighth Amendment in relation to the Defendants[2] handling of Plaintiff's medical needs from January 2018 to August 2018.  The Corrections Defendants filed an Answer to the Complaint on April 2, 2019 (ECF No. 18) and the Medical Defendants filed a Motion to Dismiss for Failure to State a Claim on May 23, 2019 (ECF No. 48).  Plaintiff filed Responses in Opposition to the Motion to Dismiss on August 15, 2019 (ECF No. 61) and August 26, 2019 (ECF No. 64).  The Medical Defendants filed a Reply Brief on August 29, 2019 (ECF No. 65) and Plaintiff filed a Response in Opposition to their Reply on September 10, 2019 (ECF No. 66).  The Motion is now ripe for review.

## II. Summary of Factual Allegations

Plaintiff alleges that on January 31, 2018, Defendant Dr. Smyth appeared at his cell for sick call, presumably in response to pain that Plaintiff was experiencing due to arthritis.  Dr. Smyth told him that the new medical director was "very strict" about approving Tramadol medication unless it was for a "serious reason" and told Plaintiff that it was not necessary for arthritis.  She educated Plaintiff about arthritis and ordered him anti-inflammatory drugs since arthritis is caused by inflammation in the joints.  Plaintiff also complained about glaucoma and cataracts in both of his eyes as well as what appeared to be a tear under both of his pupils, and Dr Smyth told Plaintiff that she would see what she could do.  Finally, Plaintiff complained that he had not yet received the steroid injections that he was supposed to get in both of his knees and Dr. Smyth explained that the doctor who was supposed to do it was now on vacation so she would have to get another doctor to do it.  (ECF No. 3, ¶ 11.)

---

[2] Defendants include Superintendent Gilmore, CHCA Wood, and CHCA Nicholson (collectively referred to as "the Corrections Defendants"), as well as Dr. Denise Smyth (incorrectly identified by Plaintiff as Ms. Smith) and Mark Hammer, PA-C (collectively referred to as "the Medical Defendants").

Plaintiff alleges that on February 6, 2018, Dr. Smyth again appeared at his cell for sick call. Presumably in response to Plaintiff's request for a stronger pain medication, Dr. Smyth said that her new boss would only approve a medication stronger than Naproxen for a serious medical need. She again explained that arthritis was a chronic condition that could be managed with steroid injections and anti-inflammatory medication to help with the pain. Plaintiff said that he had not yet received the injections, but Dr. Smyth said that the doctor who had done them quit and that the new doctor would be starting the following week. Plaintiff requested an x-ray for his elbows, but Dr. Smyth informed Plaintiff that x-rays were not necessary for suspected arthritis of his elbows because he had arthritis throughout his body, which caused inflammation in his elbows as well as his knees. Plaintiff then complained of rectal bleeding when he used the bathroom and explained that he had previously undergone two surgeries to remove hemorrhoids,[3] the last being on March 23, 2013. Dr. Smyth told Plaintiff that she would follow up on his complaints and see what she could order for his discomfort if Naproxen was not helping. (ECF No. 3, ¶ 12.)

Plaintiff alleges that on February 8, 2018, Dr. Smyth saw him after he swallowed two pens. She asked why he had swallowed the pens and told him that he was not going to get Ultram if that was why he did it. She also told him that neither she nor her boss would order him a narcotic just because he requested it and that if he did not want the medication that she prescribed for him then he would be refusing medical assistance. Plaintiff argued that Ultram was not a narcotic, he had "won" the prescription from the Secretary's Office, and that if she did

---

[3] Throughout his Complaint, Plaintiff revers to these surgeries as being for "internal hemorrhages," but, given the fact that he describes these "hemorrhages" in relation to anal bleeding, and as having to be "cut" and "burned" out, the Court assumes that he is actually referring to hemorrhoids.

not give it to him then she would be ignoring his medical file just like she was ignoring his request for an x-ray on his elbows.[4] Dr. Smyth reiterated that Plaintiff was scheduled to have knee injections the following week and reiterated that further x-rays were not necessary. In addition, presumably in response to a request for Multivitamins, she told Plaintiff that he could buy them in the commissary and explained that medical was not authorized to prescribe what inmates could purchase in the commissary.[5] (ECF No. 3, ¶ 13.)

On April 19, 2018, Defendant PA Hammer provided Plaintiff with his x-ray results from x-rays that Plaintiff had received on his wrists and elbows. They revealed "no arthritis, no broken bones, soft tissue swelling." (ECF No. 3, ¶ 43.)

Plaintiff alleges that on April 30, 2018, PA Hammer appeared at his cell for sick call in response to a sick call slip that contained the same medical complaints that Plaintiff frequently complained about. PA Hammer explained that Plaintiff could request the CHCA to review his medical records with him instead of making the same sick call requests despite no change in

---

[4] In his Response in Opposition to Defendants' Motion to Dismiss, Plaintiff repeatedly brings up that he was prescribed and took narcotics (including Ultram) or narcotic-like pain relievers from 2013 to 2016. (ECF No. 61, ¶¶ 10, 18, 30, 35.) However, it appears that Plaintiff took this pain medication for pain he was experiencing in his back, id., ¶¶ 18, 30, 35, and Plaintiff's Complaint does not allege deliberate indifference with respect to back pain, nor does it allege that he was denied this pain medication for back pain. The Response also indicates that Dr. Smyth prescribed Plaintiff numerous anti-inflammatory and pain medication for his arthritic pain, but Plaintiff alleges that the medications were always eventually discontinued after he complained that they did not work. Id., ¶¶ 11, 15, 20, 26. Plaintiff also states that his sick call slips were ignored, id., ¶ 11, but that allegation is belied by the allegations in his Complaint, which specifically concern the Medical Defendants' conduct during sick call visits.

[5] According to Plaintiff's Response in Opposition to Defendants' Motion to Dismiss, as of August 15, 2019, Plaintiff has been prescribed three different types of vitamins because he is indigent and does not have any money to buy the vitamins from commissary. (ECF No. 61, ¶ 23.)

4

condition.[6] He denied Plaintiff's request for a full-body MRI and medications including Ultram, Neurontin and Flexeril, but he did order Plaintiff hydrocortisone cream for his complaints of a rash. (ECF No. 3, ¶ 10.)

Plaintiff alleges that on June 27, 2018, PA Hammer was attending to another inmate on Plaintiff's unit when Plaintiff asked whether he was scheduled to be seen for sick call. PA Hammer responded that he had not yet received Plaintiff's sick call slip, and Plaintiff stated that he submitted it on June 21st and was told by Dr. Smyth that he would be seen on June 25th. Plaintiff asked PA Hammer to take his stool samples, and Hammer told Plaintiff that he would have a nurse come to collect them. (ECF No. 3, ¶ 15.)

Plaintiff next alleges that, on June 28, 2018, he was seen for sick call by PA Hammer who asked whether the nurse had picked up Plaintiff's stool samples from the day before because he could not find the test results. Plaintiff responded that the nurse had not yet picked them up, and PA Hammer explained that he would follow up with Plaintiff after receiving the results from the stool samples. (ECF No. 3, ¶ 14.)

Plaintiff alleges that on July 19, 2018, PA Hammer saw him for sick call. When PA Hammer asked how he could help him, Plaintiff responded, "By reading everything that I've put on my sick call list." PA Hammer explained that the things on Plaintiff's sick call slip were the same complaints he always raised, his conditions had not changed, and his treatment would not be altered. He told Plaintiff that he would not get the specific pain medication that he wanted. When Plaintiff asked about drops for his glaucoma and cataracts, PA Hammer told him that dry

---

[6] In his Response in Opposition to the Motion to Dismiss, Plaintiff states that he has made numerous requests, but he has been denied the opportunity to "see/view" his medical records. (ECF No. 61, ¶ 26.) Plaintiff seems to equate "reviewing" his medical records with "reading" his medical records, but these two things are not the same, and, generally, prisoners are not given unbridled access to their medical records due to security reasons.

eye drops were not necessary and that he was already receiving glaucoma drops at night. PA Hammer then informed Plaintiff that he would have to get back to him on Monday regarding the results of his stool samples. (ECF No. 3, ¶ 16.)

Plaintiff alleges that PA Hammer did not return to see him on Monday but that he did show up to see him for sick call on August 10, 2018. Acknowledging that Plaintiff was complaining of the same issues he previously raised during sick calls, PA Hammer asked whether Plaintiff had any new issues to report. Plaintiff again complained of his "chronic injuries" and he wanted an explanation for why he was not receiving the specific treatment and medications that he requested. PA Hammer explained that Plaintiff's blood levels tested normal, so he was not "bleeding internally", and when Plaintiff continued to protest about his bleeding PA Hammer told him that he could come up to medical for a rectal exam if he wished. PA Hammer also explained that there was no need for further x-rays of Plaintiff's elbows and knees and he also reiterated that Ultram and Neurontin were not necessary for arthritis. (ECF No. 3, ¶ 17.) Later that day, Plaintiff was given a rectal examine by PA Hammer. (ECF No. 3, p.18.)

Finally, Plaintiff alleges that he received an eye exam on August 10, 2018, and he was told that the eye pressure in his left eye was 15 and it was 17 in his right eye. (ECF No. 3, ¶ 17.)

Plaintiff states that he signed up for sick call on the following days during the time period at issue in the Complaint: January 21, January 24, January 31, February 1, February 19, February 22, April 5, April 17, April 24, April 25, May 28, June 21, July 18, August 30. (ECF No. 3, ¶¶ 22-36.) Plaintiff also states that he filed grievances complaining about his medical care on the following days: February 27 (#723903) (complaining about medical treatment, or lack thereof, that he is receiving for arthritis, "female breast implants" that grew after he took Risperidone, anal bleeding, glaucoma and cataracts, etc., and seeking proper chronic care

6

management, Ultram and Neurontin, different vitamins, and health care to "[his] satisfaction") (ECF No. 3, ¶¶ 19, 21); April 2 (#724281) (complaining about being denied adequate medical care such as a MRI, narcotics, specific vitamins, physical therapy, access to an outside hospital for glaucoma and cataracts, and seeking better and satisfactory medical care for chronic needs, medical doctors, and medical vendors) (ECF No. 3, ¶¶ 20, 21); and April 20 (#733035) (complaining that medical tampered with his prescribed lotion by putting it into a smaller sized bottle) (ECF No. 3, ¶¶ 18, 21).

As relief, Plaintiff seeks compensatory and punitive damages (ECF No. 3, p.18), as well as declaratory and injunctive relief (ECF No. 3, p.17). He specifically asks that the Court order defendants to provide him with a full body MRI and treatment for his curved spinal cord, glaucoma and cataracts, hemorrhoids, knee pain, elbow pain, arthritis, MRSA, growth of "female breast implants", right hand wrist and shoulder popping, and skin that has been damaged from the shower water at the prison. (ECF No. 3, ¶ 58.)

### III. Standard of Review

The United States Court of Appeals for the Third Circuit summarized the standard to be applied in deciding motions to dismiss filed pursuant to Rule 12(b)(6):

> Under the "notice pleading" standard embodied in Rule 8 of the Federal Rules of Civil Procedure, a plaintiff must come forward with "a short and plain statement of the claim showing that the pleader is entitled to relief." As explicated in Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), a claimant must state a "plausible" claim for relief, and "[a] claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Although "[f]actual allegations must be enough to raise a right to relief above the speculative level," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." Fowler, 578 F.3d at 213

7

> (quotation marks and citations omitted); *see also* Covington v. Int'l Ass'n of Approved Basketball Officials, 710 F.3d 114, 117–18 (3d Cir. 2013).

Thompson v. Real Estate Mortg. Network, 748 F.3d 142, 147 (3d Cir. 2014).

Additionally, when considering *pro se* pleadings, a court must employ less stringent standards than when judging the work product of an attorney. Haines v. Kerner, 404 U.S. 519, 520 (1972). When presented with a *pro se* complaint, the court should construe the complaint liberally and draw fair inferences from what is not alleged as well as from what is alleged. Dluhos v. Strasberg, 321 F.3d 365, 369 (3d Cir. 2003). In a § 1983 action, the court must "apply the applicable law, irrespective of whether the *pro se* litigant has mentioned it by name." Higgins v. Beyer, 293 F.3d 683, 688 (3d Cir. 2002) (quoting Holley v. Dep't of Veteran Affairs, 165 F.3d 244, 247-48 (3d Cir. 1999)). *See also* Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996) ("Since this is a § 1983 action, the [*pro se*] plaintiffs are entitled to relief if their complaint sufficiently alleges deprivation of any right secured by the Constitution."). Notwithstanding this liberality, *pro se* litigants are not relieved of their obligation to allege sufficient facts to support a cognizable legal claim. *See, e.g.*, Taylor v. Books A Million, Inc., 296 F.3d 376, 378 (5th Cir. 2002); Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th Cir. 1996).

## IV. Discussion

### A. Official Capacity Claims (All Defendants)

The Complaint states that Plaintiff is suing each defendant in their official capacity as well as their individual capacity. The Eleventh Amendment, however, bars federal lawsuits by private parties against states, state agencies and state officials in their official capacities. Hans v. Louisiana, 134 U.S. 1, 12-14 (1890). Furthermore, claims against state agencies and state officials in their official capacities under 42 U.S.C. § 1983 are precluded because such parties do

8

not constitute "persons" subject to liability under § 1983. Hafer v. Melo, 502 U.S. 21, 25-27 (1991). Therefore, to the extent they are sued in their official capacities, all named defendants are entitled to immunity under the Eleventh Amendment.

### B. Eighth Amendment

Plaintiff alleges that all named defendants violated the Eighth Amendment because they were deliberately indifferent to his serious medical needs. In order to state a claim for deliberate indifference under the Eighth Amendment, a plaintiff must allege two elements: (1) he was suffering from a "serious medical need," and (2) prison officials were deliberately indifferent to the serious medical need. Gamble v. Estelle, 439 U.S. 897 (1978). The first showing requires the court to objectively determine whether the medical need was "sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988). The second prong requires the court to subjectively determine whether the officials acted with a sufficiently culpable state of mind. Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993).

With respect to the "serious medical need" prong of the inquiry, Plaintiff alleges to suffer from a myriad of medical complaints. However, it appears that those medical complaints primarily stem from him having arthritis and hemorrhoids. For example, much of his Complaint alleges pain in his knees and elbows, presumably related to arthritis, and anal bleeding,

presumably related to hemorrhoids. While Plaintiff also alleges in his Complaint that he has glaucoma and cataracts in both of his eyes, and that he was refused eye drops for these conditions, he never complains that these conditions caused him to suffer a "serious medical need" of which defendants were deliberately indifferent.[7] As such, for purposes of this Opinion, the Court will consider only the serious medical needs that Plaintiff allegedly suffered from his arthritis and hemorrhoids, and will assume, without deciding, that pain from arthritis[8] and rectal bleeding from hemorrhoids[9] are considered serious medical needs.

### 1. **The Medical Defendants**

The Medical Defendants assert that Plaintiff has failed to state a claim for an Eighth Amendment violation because his allegations amount only to his dissatisfaction with the Medical Defendants' medical judgment and with the treatment that they provided to him. Despite his general claim of deliberate indifference, presumably premised on inadequate medical care and treatment, Plaintiff's allegations reveal that the Medical Defendants were quite attentive to his medical needs. He was routinely monitored by the Medical Defendants and they ordered him the

---

[7] Moreover, it appears that Plaintiff's glaucoma and cataracts were treated at an outside hospital sometime between 2013 and 2016. (ECF No. 61, ¶¶ 13, 29, 30.) His complaints about his eye care in this case appear to be about him not getting the drops ordered by the hospital or to return to the hospital every six months as allegedly directed by the hospital, id., but there are no allegations that the defendants were deliberately indifferent to any medical issues he was experiencing with his eyes during the time period in question.

[8] It is important to note, however, that Plaintiff states in his Complaint that the x-rays he received back on April 19, 2018 revealed no arthritis.

[9] In his Response in Opposition to the Medical Defendants' Motion to Dismiss, Plaintiff states that he was taken to an outside hospital in Pittsburgh on June 13, 2019 to undergo a colonoscopy. (ECF No. 61, ¶¶ 17, 30.) Plaintiff states that the doctor who performed the colonoscopy recommended "surgery," id., ¶ 33, but considering that a colonoscopy is performed in order to view and remove polyps that can cause rectal bleeding, it is unknown what the purpose of the recommended surgery would be and Plaintiff never states for what condition the doctor recommended it.

treatment that they believed was appropriate for the conditions that were substantiated by medical testing. Plaintiff's Complaint makes clear that he wanted stronger pain medication, specifically narcotics, but it also makes clear that the Medical Defendants did not believe that such medication was warranted. They explained to Plaintiff that arthritis was caused by inflammation in joints and provided him with anti-inflammatory medication to ease his arthritic pain.[10] Plaintiff never alleges that the treatment he received did not work. Furthermore, the Medical Defendants ordered lab testing and other diagnostic tests for both his arthritis and rectal bleeding and even provided Plaintiff with a rectal examination after his test results came back normal.

Plaintiff was not entitled to the specific treatment that he requested (i.e., narcotics, surgery, MRIs) and his disagreement with the Medical Defendants' diagnosis and course of treatment does not constitute deliberate indifference. *See* While v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990); Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir. 1987); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979). Indeed, it is well-established that courts will "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment." Inmates of Allegheny County, 612 F.2d at 762 (internal citation omitted). As our Court of Appeals long ago explained, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." United States ex rel. Walker v. Fayette County, Pa., 599 F.2d 573, 575 n.2 (3d Cir. 1979). Accordingly, because

---

[10] In his Response in Opposition to Defendants' Motion to Dismiss, Plaintiff states that he never received the steroid injections. (ECF No. 61, ¶¶ 14, 16.) Even if true, it does not alter the outcome of this case.

Plaintiff has not adequately alleged that the Medical Defendants' treatment of his medical needs was the result of deliberate indifference, he has failed to state a claim under the Eighth Amendment and their Motion to Dismiss will be granted.

## 2. The Corrections Defendants

Even though the Corrections Defendants have not filed a Motion to Dismiss, the Court has a statutory obligation to review a complaint brought by a prisoner proceeding *in forma pauperis* and assess whether it is frivolous, malicious; fails to state a claim upon which relief can be granted; or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii). Upon review of the Complaint, the Court finds that Plaintiff's allegations also fail to state a claim against the Corrections Defendants.

First, apart from naming the three Corrections Defendants as defendants in this case, Plaintiff does not refer to them in the body of his Complaint (apart from the section about his grievances), nor does he allege any specific wrongdoing on their part (apart from how they responded to his grievances). He states that as Corrections Health Care Administrators ("CHCA"), CHCA Wood and CHCA Bell "oversee" the "medical vendors" for the DOC's Secure Residential Treatment Unit ("SRTU") program and that they are the ones who respond to a prisoner's grievance involving sick call complaints. (ECF No. 3, ¶¶ 5, 6.) Plaintiff states that Superintendent Gilmore is simply responsible for the welfare of all prisoners incarcerated at SCI-Greene. (ECF No. 3, ¶ 3.) Thus, it appears that Plaintiff is either seeking to hold the Corrections Defendants liable based on their involvement in the handling of his administrative grievances and appeals, or simply by virtue of their respective supervisory positions. Neither, however, is enough to establish personal involvement in the constitutional harm Plaintiff is alleged to have suffered.

To establish personal liability against a defendant in a section 1983 action, that defendant "must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing Parratt v. Taylor, 451 U.S. 527, 537 n.3 (1981)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207. There are no allegations in the Complaint that the Corrections Defendants personally responded to Plaintiff's medical complaints or had any personal involvement in the treatment, or lack thereof, of those complaints, and they cannot be held liable based on a theory of *respondeat superior*. In other words, the CHCAs cannot be liable simply because they oversee the "vendors" who provide medical care to SRTU prisoners, nor can the Superintendent be liable simply because he is responsible for the prison's overall operation.

Additionally, as previously stated, the only times Plaintiff refers to the individual Corrections Defendants in the body of his Complaint are in the sections titled "Grievance Factors & Exhaust" and "Exhaustion of Grievances" wherein he cites to three grievances, sets forth the complaints he made in each and identifies the individuals who were involved in each stage of their review. (ECF No. 3, pp.9-12.) However, "a prison official's secondary review of an inmate's grievance or appeal is not sufficient to demonstrate the personal involvement required to establish the deprivation of a constitutional right." Simonton v. Tennis, 437 F. App'x 60, 62 (3d Cir. 2011) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir. 1988)). *See also* Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (holding that a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond to later-filed grievances about his medical treatment, did not establish that the officials and administrators were involved in the underlying allegedly unconstitutional conduct). In other

words, they are not liable for the underlying constitutional harm of which Plaintiff complains in his grievances simply because they participated in that grievance's review. Furthermore, to the extent Plaintiff is alleging that the Corrections Defendants did not appropriately respond to his grievances, and that itself amounts to a constitutional violation, he fails to state a claim because inmates "are not constitutionally entitled to a grievance procedure and the state creation of such a procedure does not create any federal constitutional rights." Wilson v. Horn, 971 F.Supp. 943, 947 (E.D. Pa. 1997), *aff'd*, 142 F.3d 430 (3d Cir. 1998).

Moreover, the law with respect to prison administrators is that they cannot be deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993). "If a prisoner is under the care of medical experts . . ., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (citing Durmer, 991 F.2d at 69). "This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on." Id. Thus, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." Id. At the same time, even when an inmate is under the care of prison medical staff, his condition might be "so dire and obvious that [a non-medical prison official's] failure to summon immediate medical attention . . . amount[s] to deliberate indifference." Id. at 237. As one district court has explained:

> if the prisoner's skin appears blue or he appears short of breath for no apparent

> reason, or his appearance otherwise suggests to a layperson that the prisoner may need medical attention, guards cannot simply leave the prisoner to his possible fate on the theory that he has been receiving regular medical care and is "in capable hands." The judgment of the medical personnel necessarily is based on the information available to them when they last saw the prisoner and/or last reviewed his file. It is generally absurd for guards to assume that medical staff are aware of the prisoner's condition at the current moment: how would a doctor or nurse who examined a prisoner even an hour ago know that at this minute, without his presence, the prisoner appears to be experiencing signs/symptoms of a medical problem?

Roberts v. Hacken-Joe, No. 1:08-CV-458, 2009 WL 2356262, at *4 (W.D. Mich. July 29, 2009).

The Complaint alleges that Plaintiff was receiving some medical attention during the time period at issue and so the Corrections Defendants generally cannot be said to be deliberately indifferent. There are no allegations that any of the Corrections Defendants personally encountered the Plaintiff in a state of medical duress (or at all) or that they were directly aware of any condition that required immediate medical attention of which he was not already receiving. For all of these reasons, Plaintiff has failed to state a claim against the Corrections Defendants upon which relief can be granted and they are entitled to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

## C. Fourteenth Amendment

Finally, Plaintiff alleges that the defendants violated the "Eighth and Fourteenth Amendments" (ECF No. 3, p.14) but it does not appear that Plaintiff is asserting a separate Due Process Clause violation. As such, the Court understands this reference to merely be an acknowledgement that the Eighth Amendment applies to the states through the Fourteenth Amendment. *See* Sistrunk v. Lyons, 646 F.2d 64, 66-67 (3d Cir. 1981) (citing Robinson v. California, 370 U.S. 660 (1962)).

### D. **Amendment of the Complaint**

The court must allow amendment by the plaintiff in civil rights cases brought under § 1983 before dismissing pursuant to Rule 12(b)(6), irrespective of whether it is requested, unless doing so would be "inequitable or futile." Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 251 (3d Cir. 2007); *see also* Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004) (asserting that where a complaint is vulnerable to dismissal pursuant to 12(b)(6), the district court must offer the opportunity to amend unless it would be inequitable or futile). The Court is cognizant of these holdings but finds that allowing for amendment by Plaintiff would be futile int his case. A careful review of the record commands that Plaintiff, even garnering all the liberalities that accompany his *pro se* status, fails to state any claims under § 1983 for which relief may be granted. A separate Order follows.

Dated: November 22, 2019.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Cc:  Jerome Junior Washington
     HV-0282
     SCI Greene
     175 Progress Drive
     Waynesburg, PA  15370

     Counsel for Defendants
     (Via CM/ECF electronic mail)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEROME JUNIOR WASHINGTON, | ) | |
| | ) | Civil Action No. 18 – 1558 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| SUPERINTENDENT GILMORE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

For the reasons set forth in the Court's accompanying Memorandum Opinion,

**IT IS HEREBY ORDERED** that the Motion to Dismiss filed by Defendants Hammer and Smith is granted for Plaintiff's failure to state a claim upon which relief may be granted.

**IT IS FURTHER ORDERED** that Defendants Gilmore, Wood and Nicholson are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for Plaintiff's failure to state a claim upon which relief may be granted.

**IT IS FURTHER ORDERED** that Plaintiff's Complaint is dismissed with prejudice.

**IT IS FURTHER ORDERED** that the Clerk of Court mark this case closed.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Plaintiff has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

Dated: November 22, 2019.

Lisa Pupo Lenihan
United States Magistrate Judge