**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JEROME JUNIOR WASHINGTON,    )
    )    Civil Action No. 18 – 1558
    Plaintiff,    )
    )
    v.    )    Magistrate Judge Lisa Pupo Lenihan
    )
MR. HAMMER, PA-C, and    )    ECF No. 118
DIRECTOR SMITH,    )
    )
    Defendants.    )

## MEMORANDUM OPINION[1]

    Pending before the Court is a Motion for Summary Judgment filed by the remaining Defendants in this action, Dr. Denise Smyth[2] ("Dr. Smyth") and Mark Hammer, PA-C ("PA Hammer") (collectively, "Medical Defendants").  (ECF No. 118.)  For the following reasons, the Motion will be granted.

### A. Procedural Background

    Plaintiff, Jerome Junior Washington ("Plaintiff"), is an inmate currently in the custody of the Pennsylvania Department of Corrections ("DOC").  He initiated this *pro se* prisoner civil rights action in November 2018, and his Complaint was docketed after he was granted leave to proceed *in forma pauperis* on November 27, 2018.  (ECF Nos. 1-3.)

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment.  (ECF Nos. 25, 31, 78.)

[2] Plaintiff incorrectly identifies Dr. Smyth in his Complaint as "Ms. Smith"

On November 22, 2019, this Court granted the Medical Defendants' motion to dismiss and dismissed the other named Defendants pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  (ECF No. 80.)  On appeal, the Third Circuit Court of Appeals vacated the judgment to the extent it dismissed the deliberate indifference claims asserted against the Medical Defendants with respect to the treatment of Plaintiff's arthritis and hemorrhoids from January through August 2018 ("the relevant time period"), while he was an inmate at SCI-Greene.  (ECF Nos. 87 & 88.)

Following remand, a brief period of discovery took place, after which the Medical Defendants filed a Motion for Summary Judgment, a Brief in support and a Concise Statement of Material Facts.  (ECF Nos. 118-20.)  Plaintiff then filed numerous Responses in opposition. (ECF Nos. 135, 136, 138.)  The Motion is now ripe for review.

## B. <u>Factual Background</u>

In their Statement of Material Facts in Support of Summary Judgment,[3] the Medical Defendants submitted a compressive recitation of Plaintiff's medical records from the Department of Corrections from January 2017 through October 2020.  However, only those portions of his records that primarily relate to Plaintiff's medical care and treatment for his arthritis and rectal bleeding/hemorrhoids will be discussed.[4]

---

[3] While Plaintiff did respond to the Medical Defendants' Brief, he failed to respond to their Statement of Material Facts (ECF No. 119) by either admitting or denying the facts set forth therein as required by Local Rule 56 and as the Court previously instructed Plaintiff to do by way of its Order dated October 28, 2021 (ECF No. 121).  *See* Local Rule 56.C.1 (requiring non-moving parties to a motion for summary judgment to file a responsive concise statement in which they must: respond to each numbered paragraph in the movant's concise statement; admit or deny the facts contained in the movant's concise statement; set forth the basis for denial if any fact within the movant's concise statement is not entirely admitted by the non-moving party, with appropriate citation to the  record; and set forth, in separately numbered paragraphs, any other material facts at issue).  As a consequence, all facts set forth in the Medical Defendants' Statement of Material Facts will be deemed admitted.  *See* Local Rule 56.E; *see also* <u>Enigh v. Miller</u>, Civil No. 08-1726, 2010 WL 2926213, at *4 (W.D. Pa. July 23, 2010) (collecting cases).

[4] Plaintiff's medical records are extensive and reveal that he was regularly seen by medical professionals for numerous complaints and self-inflicted injuries.  During many, if not most, of the contacts with medical staff, the records indicate that Plaintiff complained of multiple ailments at a time, not simply arthritic pain and rectal bleeding.

1.  **January 2018 through August 2018**

On January 2, 2018, Dr. Smyth saw Plaintiff while he was in a psychiatric observation cell (POC).  He reported that he was still having problems with hemorrhoids and had some rectal bleeding with bowel movements.  He reported having had surgery twice in the past.  He asked about physical therapy for his knees which he said hurt all of the time.  He appeared alert and in no acute distress.  He had a normal gait.  Assessment included hemorrhoids and knee pain.  Dr. Smyth noted that she reviewed his medications and ordered suppositories for his hemorrhoids. She also planned to further examine him for possible physical therapy once he was out of the POC and to consider anti-inflammatories.  (ECF No. 119, ¶ 27.)

Dr. Smyth saw Plaintiff again on January 3, 2018, at which time he voiced multiple medical problems.  He reported chronic back pain and that he had not been on any medications. He also reported that when he was at SCI-Graterford, he was told that he may need epidural injections.  He stated that he had a history of anemia and had taken iron in the past.  He also said that he had bloating in his abdomen, as well as a problem with his thyroid.  Dr. Smyth noted that he appeared alert and in no acute distress.  She noted that he was refusing to have his vitals taken.  He was assessed at the cell door.  Dr. Smyth told him that she would review his chart, and he agreed to having lab work performed that day to check for anemia, iron deficiency, and thyroid problems.  She advised that she would discuss further needs once she had his lab work back.  She also planned to review his medications for his back.  He was to remain in the POC as per psych.  It was noted that he refused a suppository and eye drops that day.  Id., ¶ 28.

---

However, in order to focus only on the remaining issues in this case, the Court will limit its summary of Plaintiff's interactions with medical staff only as it pertains to his complaints and care for arthritic pain and rectal bleeding.

Plaintiff had lab work performed on January 3, 2018, including a blood panel.  Dr. Smyth noted that the results indicated a Vitamin-D deficiency, so she planned to order supplements. Id., ¶ 29.

Dr. Smyth saw Plaintiff again on January 4, 2018, while he was still housed in the POC. Plaintiff reported concern about his medications.  He said that he had chronic back pain and that he was on Ultram (Tramadol) in the past.  He also complained about pain in his knees, as well as hemorrhoids.  Dr. Smyth again noted that he appeared alert and was in no acute distress.  His gait was normal while walking in his cell.  Dr. Smyth planned to check the X-rays of his knees, thoracic spine, and lumbar spine.  She also planned to start him on NSAIDS.  He was to follow up in clinic.  Later that day, RN Beers noted that Plaintiff refused to leave the POC despite being cleared by psych because he wanted Ultram.  It is reported that Plaintiff stated, "I don't want that fucking shit . . . fuck that Naproxen."  RN Beers noted that she had discussed with Dr. Smyth that he was to receive 375mg of Naproxen.  He refused to take the medication and to leave the POC.  Security then extracted him with the use of pepper spray.  He was taken to triage where his eyes were decontaminated and was later placed back in POC.  He also refused his eye drops and suppository as ordered.  Id., ¶¶ 30-31.

On January 31, 2018, Dr. Smyth saw Plaintiff at his cell door in the RHU.  He continued to complain of having weak bones and joint pains.  Dr. Smyth noted that he recently had X-ray studies of his knees which confirmed arthritic changes.  Plaintiff requested X-rays of his elbows, arms, wrists, and hands.  Dr. Smyth informed him that he did not require X-rays of all of his joints because he had no injuries and told him that his joint pain was related to arthritis pain. Plaintiff also complained that he needed Ultram and Neurontin (Gabapentin) for his pain because he was suffering.  Dr. Smyth noted that he was currently on Naproxen, but Plaintiff said that it

was not doing anything and insisted that he needed Ultram.  On exam, he was alert and in no acute distress.  His gait was normal, and he breathed easily.  Assessment included joint pain.  Dr. Smyth noted that even after a repeated discussion about his joint pain, he continued to insist on other pain medications.  She informed him that other medications were not medically indicated at that time.  She also informed him that she did not feel he needed Ultram at that time.  Id., ¶ 34.

Dr. Smyth saw Plaintiff again on February 2, 2018, after he placed a sick call slip requesting X-rays of his joints.  Additionally, he requested Ultram, as well as steroid injections in his knees.  Dr. Smyth reviewed Plaintiff's recent lab work and medical chart.  She noted that all of his labs were normal except for a Vitamin-D deficiency.  Plaintiff was also noted as having refused recent requests for vitals.  The assessment included joint pain and requests for medications.  Dr. Smyth noted that Plaintiff was on Naproxen which is indicated for joint pain and that there was no medical need for Ultram at that time.  She also discussed the risk of infection with injection to his knees.  He was to follow up as needed.  Id., ¶ 36.

Dr. Smyth saw Plaintiff at his cell door in the RHU on February 6, 2018.  He made multiple complaints at that time.  Dr. Smyth noted that she discussed his joint pain with him and educated him that it was due to arthritis.  She also informed him that without an acute injury, there was no indication for X-rays of all of his joints as he requested.  He also complained of hemorrhoids and said that he had previously undergone surgery for hemorrhoids.  He reported having some bleeding with bowel movements.  He again insisted on being prescribed Ultram and steroids.  Dr. Smyth informed Plaintiff that NSAIDS are indicated for arthritis.  On exam, he appeared alert and in no acute distress.  He breathed easily, and his gait was normal.  He had moist mucous membranes.  Assessment included joint pain and hemorrhoids.  Dr. Smyth placed orders for procto 1% cream and preparation H.  She also noted that at that time there was no

5

medical necessity for Ultram.  She planned to continue his current medications and also ordered Voltaren (Diclofenac) 50mg, two times daily, for joint pain.  Id., ¶ 37.

On February 8, 2018, it was noted that Plaintiff swallowed a pen and had also reopened an old cut to his left inner elbow (antecubital space) with the use of a staple.  He reported swallowing "pens."  The cut was cleansed and bandaged with steri-strips.  Dr. Smyth saw him while he was in triage after swallowing pens.  He again demanded pain medication and X-ray studies of all of his joints.  He continued to say that he was given Ultram and Neurontin in the past and he demanded that he be given these medications again.  He claimed that his medical conditions were not being treated.  Dr. Smyth noted that the X-rays of his knees did show some arthritis, but he refused to take NSAIDs because it was not the medication he wanted.  It was reported that he then became verbally abusive during the visit, so it was terminated.  The plan was to continue his current medications and to conduct an X-ray study in the morning.  Id., ¶¶ 38-39.

Plaintiff underwent a series of X-ray studies on February 9, 2018.  The studies and their findings include the following:

- Abdomen (KUB):  The study revealed nonspecific bowel gas with a moderate amount of stool.  There was no small bowel obstruction or free air.  There were three (3) metallic foreign bodies measuring about 1.2 x 0.2 cm with adjacent radiosities consistent with pens in the left upper quadrant, probably in the stomach.

- Left wrist:  The study revealed soft tissue swelling with no fracture, dislocation, or bone erosion.

- Left elbow:  The study revealed soft tissue swelling with no fracture, dislocation, or joint effusion.

- Right wrist:  The study revealed soft tissue swelling with no fracture, dislocation, or bone erosion.

- Right elbow:  The study revealed soft tissue swelling with no fracture, dislocation, or joint effusion.

Id., ¶ 41.

On February 23, 2018, PA Hammer noted that Voltaren (Diclofenac), and NSAID, was renewed for Plaintiff's general complaints of pain.  Id., ¶ 42.

On March 6, 2018, PA Hammer saw Plaintiff for his requests of chronic care medications, Neurontin and Ultram.  Plaintiff reported needing these medications for his curved spine and torn tissue in his knees.  He also reported being approved for these medications by central office and threatened to file a lawsuit and grievance if he did not receive them.  He also wanted steroid shots in his knees.  PA Hammer noted that he saw Plaintiff at his cell door at which time Plaintiff displayed no overt pain behavior but was argumentative.  Assessment included complaints of pain and the plan was to continue monitoring while Plaintiff was in the POC.  Id., ¶ 43.

Plaintiff underwent an X-ray of his abdomen on March 22, 2018, as ordered by Dr. Smyth.  The study revealed nonspecific bowel gas pattern with a moderate amount of stool. There was no small bowel obstruction or free air.  Additionally, there was no definite radiopaque foreign body identified.  Id., ¶ 44.

PA Hammer saw Plaintiff at his cell door on April 2, 2018.  It is noted that Plaintiff demanded a full body MRI, Neurontin, and Ultram for a spinal cord injury.  PA Hammer noted that Plaintiff was argumentative and stated, "you're only a PA you can't order that stuff.  It has to come from central office."  His assessment included arthralgia and the plan was to renew Plaintiff's prescription for Voltaren.  Id., ¶ 45.

PA Hammer saw Plaintiff on May 1, 2018.  PA Hammer noted that Plaintiff insisted on getting Neurontin, Ultram and Flexeril, which he claimed was approved by the central office.  He reported having arthritis in his knees and elbows that was not being cared for.  PA Hammer noted that Plaintiff's medical records confirmed that he was receiving NSAIDs.  His assessment included arthritis and the plan was to continue the current treatment.  Id., ¶ 49.

PA Hammer saw Plaintiff on May 29, 2018, for Plaintiff's complaints of occasional rectal bleeding.  PA Hammer noted that Plaintiff once again claimed that he should be getting Neurontin and Ultram and that these were approved by the CHCA.  PA Hammer's initial assessment was rectal bleeding, and Plaintiff was provided three hemoccult cards for an occult blood test.  Id., ¶ 51.

On June 25, 2018, RN Stilton completed a GI Bleed Complaint form, as Plaintiff complained of reoccurring rectal bleeding.  He reported having had rectal bleeding before due to internal hemorrhoids.  He reported that his last surgery for hemorrhoid removal was in 2016 and bleeding had reoccurred.  He denied vomiting, pain, lethargy, and dizziness.  He also reported that his last bowel movement was that day, which consisted of diarrhea and was red in color.  On exam, he appeared in no acute distress.  His mucous membranes were moist.  Bowel sounds were present and his abdomen was non-tender.  Additionally, a hemoccult test was negative.  He was then provided with occult blood stool cards and instructed on how to use them.  Id., ¶ 57.

## 2.  Complaints of rectal bleeding after August 2018

Although the time period at issue in this case concludes in August 2018, Plaintiff's medical records reveal that he continued to make complaints about rectal bleeding for which he was regularly seen by medical professionals.  During this time, he was given numerous rectal exams and prescribed hemorrhoid ointment,  although his records indicate that he was

8

approximately 55% compliant with use.  Id., ¶¶ 67, 69, 71, 73, 76, 82-83, 86, 99, 102.  He was also prescribed suppositories and Tucks pads for symptom relief, although ultimately all proved to be unsuccessful.  Id., ¶¶ 83, 102.  On May 2, 2019, Dr. Smyth noted that she had discussed Plaintiff's hemorrhoids with the state medical director for further advice on treatment.  The plan was to provide Docusate (Colace), Hydrocortisone suppositories, Metamucil, and Lidocaine ointment, and to follow up in two weeks to see if the medications had improved his symptoms.  She also planned to present to collegial for surgical consult if symptoms continued.  Id., ¶ 106.  His case was presented to collegial on May 7, 2019, and the plan was to increase Plaintiff's fiber and to continue his medications and suppositories.  Id., ¶ 108.

On May 24, 2019, it was noted that Plaintiff had been approved for a colonoscopy.  Id., ¶ 114.  Plaintiff underwent a colonoscopy on June 13, 2019, which revealed a grade 2 internal hemorrhoid and anal skin tag.  No active bleed was noted and the plan included fiber supplement and plenty of fluids.  Id., ¶ 121.

On September 4, 2019, PA Hammer noted that Plaintiff still complained of bleeding from hemorrhoids.  Id., ¶ 140.  On September 11, 2019, PA Hammer attempted to see Plaintiff for his complaints of rectal bleeding, but Plaintiff was in the yard.  It is noted that PA Hammer planned to submit his case to collegial review for hemorrhoid surgery consideration.  Id., ¶ 142.  On September 14, 2019, Dr. Sramat noted that he saw Plaintiff who reported heavier rectal bleeding for two days with three episodes on September 13th and two episodes that day.  Plaintiff demonstrated that he was having active bleeding when he would assume a squatting position, and Dr. Stramat directed that he be sent to the hospital emergency room.  Id., ¶ 143.

Plaintiff was transported to Washington Hospital-Greene on September 14, 2019.  Id., ¶ 144.  He was then transferred to Washington Hospital (main) the following day.  Id., ¶ 145.  It

was noted that Plaintiff had a history of hemorrhoids and foreign body insertions at SCI-Greene and that he had undergone a colonoscopy on June 13, 2019, which showed internal hemorrhoids. He was found to have a hemoglobin of 4.1, so he was transfused at Washington Greene with 3 units before arriving to Washington Hospital.  At that time, he was in no acute distress but complained of multiple joint paints.  He reported having dark red blood per rectum with every bowel movement for "weeks."  He denied foreign body insertion or ingestion.  On exam, he denied abdominal pain, nausea, vomiting, or diarrhea.  The abdomen was soft, without detectable tenderness.  No sign of distention.  No rebound or guarding, and no masses palpated.  Bowel sounds were normal.  No obvious bleeding of the rectum.  He also had good range of motion of all major joints; no edema noted.  Assessment included acute anemia secondary to hematochezia (blood in stool) and iron deficiency.  Additionally, the assessment included bilateral knee pain and deep vein thrombosis.  Id., ¶ 145.

While at Washington Hospital on September 15, 2019, Plaintiff had surgical and gastrointestinal consults.  He reported increased rectal bleeding over the past several months.  It was determined that there was no indication for surgery, and, following a physical exam, the gastroenterologist made an assessment of acute blood loss anemia with hematochezia.  The plan was to proceed with an esophagogastroduodenoscopy (EGD), and if negative, to proceed with a colonoscopy.  Id., ¶ 146.

Plaintiff had a colonoscopy on September 17, 2019, which revealed inflamed erythematous grade 2 internal hemorrhoids with evidence of recent bleeding.  EGD and bleeding scans were normal.  Surgery was consulted and the internal hemorrhoids were excised that day. Id., ¶ 147.  Plaintiff was discharged from Washington Hospital and returned to SCI-Greene on

September 19, 2019.  The discharge diagnoses included hematochezia (blood in stool), internal

hemorrhoids, and iron deficiency anemia.  Id., ¶ 148.

### 3.  Complaints of arthritic pain after August 2018

Plaintiff similarly continued to complain of pain to his knees, hands, wrists, elbows, and

back after August 2018.  His medical records indicate that Plaintiff believed the pain to stem

from torn tissues, which he claimed were not visible on X-ray, and a "curved spinal cord

touching vertebrae."  Id., at ¶¶ 111, 136, 138, 167, 177, 179.  His medical records indicate that he

was regularly seen by medical professionals for his complaints of pain.  It was noted that he

routinely participated in yard activity to exercise, he was always observed with a normal gait and

full range of motion, and he never displayed obvious discomfort or exhibited overt pain behavior

during visits.  Id., at ¶¶ 69, 71, 111, 114, 130, 132, 157, 167, 175, 177.  When examined, no

edema was ever noted to his hands, wrists or elbows, and the numerous X-ray studies of his

joints and spine were unremarkable.  Id., at ¶¶ 68, 78, 108, 114-15.  Despite this, Plaintiff was

prescribed a host of medications in numerous dosages, which he always claimed were

ineffective, including Tylenol, Motrin, Naprosyn, Aleve, Relafen, Mobic, Voltaren, Celebrex,

Prednisone, Pamelor, and Cymbalta.  Id., at ¶¶ 108, 115, 117, 119, 123, 125, 130, 135-36, 138,

140, 152-53, 156-57, 167-68, 170, 174-75, 179, 183.  He was also referred to physical therapy.

Id., at ¶ 114-15.  It was well documented that he had failed essentially every formulary oral

medication for his arthralgia in an attempt to receive the medication that he wanted, namely

Ultram and Neurontin.  Id., at ¶¶ 136, 167, 175, 182.  His records indicate that he was diagnosed

with attention/drug seeking behavior and somatization disorder.  Id., at ¶¶ 177, 180.

Plaintiff's complaints continued when he was transferred to SCI-Rockview in June 2020.

Id., at ¶¶ 185-192.  He again requested either Ultram or Neurontin for his pain, but he was told it

was not medically necessary.  Id., at ¶¶ 186, 189.  X-ray studies of his knees and spine were

again unremarkable, and he was observed to have good range of motion and was able to stand

and walk without difficulty.  Id., at ¶¶ 187-88, 190-92.  He was scheduled for physical therapy

but did not show up for his appointments.  Id., at ¶ 192.  He was told to obtain NSAIDs from the

commissary as there was no indication for pain management.  Id., at ¶ 191.  No further medical

records are provided past October 2020.

## C.  Standard of Review

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving

party, "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Summary judgment may be

granted against a party who fails to adduce facts sufficient to establish the existence of any

element essential to that party's case, and for which that party will bear the burden of proof at

trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence, or the lack thereof,

which demonstrates the absence of a genuine issue of material fact.  Nat'l State Bank v. Fed.l

Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992) (citing Celotex, 477 U.S. at

323-25).  Once that burden has been met, the nonmoving party may not rest on the allegations in

the complaint, but must "go beyond the pleadings and by [his] own affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324 (quoting FED. R. CIV.

P. 56(e) (1963).  See also Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995)

("plaintiff cannot resist a properly supported motion for summary judgment merely by restating

the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case.") (citing Celotex, *supra*).

An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In Anderson, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. …[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Id. at 249-50 (internal citations omitted).

### D. Discussion

The only claims remaining in this action are Plaintiff's claims that the Medical Defendants violated the Eighth Amendment by displaying deliberate indifference to his arthritis pain and hemorrhoids from the time period spanning January 2018 through August 2018.[5]  The Eighth Amendment requires that prisons provide inmates with adequate medical care. Estelle v. Gamble, 429 U.S. 97, 103 (1976).  A prison official's deliberate indifference to an inmate's serious medical needs thus runs afoul of the Eighth Amendment's prohibition on cruel and unusual punishment.  Pearson v. Prison Health Serv., 850 F.3d 526, 534 (3d Cir. 2017) (citing Estelle, 429 U.S. at 104-05).  To succeed on an Eighth Amendment medical care claim, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective showing that 'those needs were serious.'"  Id.

---

[5] Plaintiff devotes portions of his responsive brief to allegations that the Medical Defendants, as well as other medical and non-medical professionals at SCI-Greene, were deliberately indifferent to other medical conditions, including his cataracts and glaucoma.  With respect to any such claim, Plaintiff is referred to footnote 3 of the Third Circuit's Opinion dated February 3, 2021.  *See* ECF No. 88-1.

(quoting Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).  The parties do not appear to dispute that Plaintiff's hemorrhoids and arthritis were serious medical needs.  Thus, the Court's inquiry focuses on whether the record contains any genuine issues of fact as to whether the Medical Defendants acted with deliberate indifference with respect to such needs.

      To make out a subjective showing of deliberate indifference, Plaintiff has to demonstrate that the Medical Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the Medical Defendants also drew that inference.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  In other words, Plaintiff must show that the Medical Defendants "acted or failed to act despite [their] knowledge of a substantial risk of harm."  Id. at 842.  Plaintiff can make a subjective showing of deliberate indifference by adducing circumstantial evidence that "the excessive risk was so obvious that [the Medical Defendants] must have known of the risk."  Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 842).

      The Third Circuit has found prison officials to be deliberately indifferent in a number of circumstances, "including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."  Rouse, 182 F.3d at 197.  However, it is well-settled that a plaintiff cannot show deliberate indifference by demonstrating negligence in addressing a medical condition or a disagreement over the course of treatment received.  See Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993) (explaining that deliberate indifference requires something "more than negligence"); Monmouth Cty. Corr. Institutional Inmates v.

14

Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) ("[M]ere allegations of [medical] malpractice do not raise issues of constitutional import."); id. ("[M]ere disagreements as to the proper medical treatment [does not] support a claim of an [E]ighth [A]mendment violation.").

Broadly speaking, Plaintiff claims that the Medical Defendants offered ineffective medications for his arthritis pain and refused to order the testing and medication that Plaintiff thought was necessary, namely full-body CT or MRI scans, steroid injections and Ultram[6] and Neurontin.  Although his claims of deliberate indifference with respect to his rectal bleeding and hemorrhoids are not as clear, it appears he claims that the Medical Defendants delayed treatment for no good medical reason until it became an emergency and he required blood transfusions.

With respect to his claims of deliberate indifference regarding treatment for his arthritis pain, the record demonstrates a classic case of disagreement between the course of treatment offered to Plaintiff and the course of treatment that Plaintiff desired.  Plaintiff's complaints of pain were regularly evaluated by the Medical Defendants, and he received treatment in the form of numerous medications and diagnostic X-rays that the Medical Defendants felt were clinically indicated.  To the extent Plaintiff complains that those medications and procedures were not effective or were not interventions that he preferred, such disagreement does not rise to the level of a constitutional violation.

The deliberate indifference standard affords considerable deference to prison doctors in the diagnosis and treatment of medical problems on inmates, and courts will not second-guess the propriety or adequacy of a particular course of treatment if it is a question of sound professional judgment.  Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir.

---

[6] Ultram, or Tramadol, was reclassified by the FDA as a narcotic in 2014.

1979).  There is nothing in the record to suggest that the Medical Defendants did not use their best medical judgment when prescribing what they believed to be medically appropriate treatment for Plaintiff's arthritis pain, and the Court will not second guess the propriety or the adequacy of the course of treatment with which Plaintiff was provided even if it was unsuccessful or ineffective.  Indeed, evidence of unsuccessful medical treatment, such as the inability to reduce pain, is insufficient to establish deliberate indifference, and there is no guarantee that any other course of treatment was medically necessary or would have been effective.  *See* Ascenzi v. Diaz, 247 F. App'x 390, 391 (3d Cir. 2007) (no deliberate indifference where plaintiff was provided pain medication and antibiotics instead of narcotic pain relievers for his herniated cervical discs); Thomas v. Coble, 55 F. App'x 748, 749 (6th Cir. 2003) (summary judgment properly granted to prison physician despite inmate's disagreement with physician over adequacy of pain medication and allegation that he suffered in excruciating pain for six months); *see also* Castro v. Kastora, No. 18-1029, 2018 WL 4538454, at *6 (E.D. Pa. Sept. 20, 2018 (use of ibuprofen and Tylenol instead of Oxycodone or other narcotics did not amount to deliberate indifference; "[t]he medical staff did not withhold pain medication [but] merely exercised their medical judgment in providing [plaintiff] with a different medication than what he wanted."); Heigelmann v. Prince, No. 5:11cv130, 2012 WL 760839, at *7 (E.D. Tex. Jan. 27, 2012) (no deliberate indifference where inmate was repeatedly given various types of pain medication and steroid injections in an effort to relieve his back pain and inmate complained that nothing was effective), *report and recommendation adopted at* 2012 WL 760832 (E.D. Tex. Mar 8, 2012); Rochell v. Corr. Med. Servs., No. 4:05CV268, 2006 WL 1422988, at *4 (N.D. Miss. April 10, 2006) ("The constitution does not . . . guarantee pain-free medical treatment….  While the plaintiff might have preferred stronger medication, his mere

disagreement with his medical treatment does not state a constitutional claim."), *report and recommendation adopted at* 2006 WL 1423189 (N.D. Miss. May 16, 2006); Goodson v. Browne, No. 6:05cv4, 2005 WL 1026186, at *3 (E.D. Tex. Apr. 29, 2005) (no deliberate indifference by prison doctor who proscribed inmate numerous pain medications that were not the narcotic medications the inmate specifically requested and which the inmate claimed were ineffective because "there is no constitutional right to a non-existent miracle cure").  The Court finds that the Medical Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim insofar as he claims they were deliberately indifferent to his arthritis pain.

With respect to Plaintiff's claim that the Medical Defendants were deliberately indifferent by delaying treatment for his rectal bleeding and hemorrhoids for no good medical reason despite multiple complaints and a prior history of hemorrhoids that required surgical removal, it is noted that a deliberate indifference claim premised on delayed medical treatment requires a plaintiff to demonstrate that "the delay . . . was motivated by non-medical factors." Pearson, 850 F.3d at 537.  The lack of an identifiable medical reason explaining a treatment delay does not necessarily mean that the delay was motivated by a non-medical reason.

The record here does not support a finding that there was any delay in treating Plaintiff's rectal bleeding and hemorrhoids, much less a delay attributable to the Medical Defendants that was motivated by non-medical factors, such as a desire to punish Plaintiff, to lessen their own workload or to save the DOC money.  *See, e.g.*, Durmer, 991 F.2d at 68-69 (reversing summary judgment for defendant doctor, in part because the record contained evidence that the denial of medical treatment was motivated by a desire to avoid the "burden and expense" the prison would have incurred).  Instead, the record reveals that during the relevant time period at issue herein, from January to August 2018, Plaintiff was seen multiple times for his complaints of occasional

rectal bleeding and each time he was assessed with hemorrhoids and provided with medications and treatments that the Medical Defendants deemed medically appropriate, including suppositories, hydrocortisone cream and preparation H, which he did not always use as directed. He was provided with hemocult cards for occult blood tests when he complained of rectal bleeding in May and June of 2018.  His records reveal that he did not start to complain of consistent and more severe rectal bleeding until after the relevant time period herein had already concluded, at which time he was approved for a colonoscopy that he received on June 13, 2019. [7] In early September 2019, there was a plan to submit Plaintiff's case to collegial review for hemorrhoid surgery after he presented with rectal bleeding that did not resolve.  However, before that could happen, Plaintiff presented with heavier bleeding starting September 13, 2019, and he was sent to the emergency room where he received transfusions, surgical and gastrointestinal consults and ultimately another colonoscopy followed by a hemorrhoidectomy on September 18, 2019.

Despite Plaintiff's allegations to the contrary, the record does not reveal that Plaintiff's requests for hemorrhoid treatment were denied, deferred or delayed during the times he complained of rectal bleeding from January through August 2018, or any time thereafter, although such period is not at issue.  Indeed, he was provided with treatment for his

---

[7] The record reveals that Plaintiff only occasionally complained of rectal bleeding during the numerous times he was seen by medical staff during the relevant time period, and he was prescribed treatment for his hemorrhoids in each instance.  Plaintiff complained of rectal bleeding with bowel movements on January 2, 2018.  He was assessed with hemorrhoids and prescribed suppositories.  He refused his suppositories the following day.  He again complained of hemorrhoids on January 4, 2018, assessed with hemorrhoids and again refused his suppository as ordered.  He did not complain of hemorrhoids again until February 6, 2018, at which time he was prescribed hydrocortisone cream and preparation H.  No further complaints of rectal bleeding followed until May 29, 2018, at which time he said he had occasional rectal bleeding and he was provided with three hemocult cards for an occult blood test.  On June 25, 2018, his hemocult test was negative and he was again provided with occult blood stool cards.  In September 2018, after the relevant time period herein concluded, he complained of hemorrhoids and his hemocult test was positive. Medical then requested and awaited outside records from the gastrointestinal doctor and subsequently requested approval for a colonoscopy.

hemorrhoids, which, given a record that reveals only occasional and sporadic complaints of rectal bleeding during the relevant time period, appeared to resolve or alleviate his symptoms despite a compliance rate of less than 100%, and he was provided with more extensive treatment when his bleeding became more severe later on.  It is unclear whether Plaintiff is asserting that he should have received a hemorrhoidectomy earlier, but such a finding would, at most, amount to medical negligence and not an Eighth Amendment violation.  Since the record is clear that the Medical Defendants used their professional judgment when prescribing Plaintiff medical treatment that they deemed appropriate for his hemorrhoids, and there is no evidence in the record that they delayed or denied him treatment for non-medical reasons, the Medical Defendants will be granted summary judgment on this claim as well.

A separate order will issue.

Dated:  March 16, 2023

Lisa Pupo Lenihan
United States Magistrate Judge

Cc:    Jerome Junior Washington
       HV-0282
       SCI Rockview
       Box A
       1 Rockview Place
       Bellefonte, PA  16823

       Jerome Junior Washington
       HV-0282
       SCI Forest
       P.O. Box 945
       286 Woodland Drive
       Marienville, PA  16239

19

Counsel for Defendants
(Via CM/ECF electronic mail)

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JEROME JUNIOR WASHINGTON,    )
            )    Civil Action No. 18 – 1558
        Plaintiff,    )
            )
        v.         )    Magistrate Judge Lisa Pupo Lenihan
            )
MR. HAMMER, PA-C, and    )
DIRECTOR SMITH,        )
            )
        Defendants.    )

## <u>ORDER</u>

**AND NOW**, this 16th day of March, 2023,

**IT IS HEREBY ORDERED** that, for the reasons stated in the Court's Memorandum

Opinion issued contemporaneously herewith, the Motion for Summary Judgment filed by the

Medical Defendants (ECF No. 118) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment in favor of

Defendants and mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that, pursuant to Federal Rule of Appellate

Procedure 4(a)(1), if Plaintiff desires to appeal from this Order he must do so within thirty (30)

days by filing an appeal as provided for in Federal Rule of Appellate Procedure 3.

Lisa Pupo Lenihan
United States Magistrate Judge

Cc:    Jerome Junior Washington
HV-0282
SCI Rockview
Box A
1 Rockview Place
Bellefonte, PA  16823

Jerome Junior Washington
HV-0282
SCI Forest
P.O. Box 945
286 Woodland Drive
Marienville, PA  16239

Counsel for Defendants
(Via CM/ECF electronic mail)